UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON ERIK PLAINTIFF,<br>Plaintiff,<br>v.<br>K.M. AYE,<br>Defendant. | No. 1:23-cv-01125-JLT-SAB (PC)<br>FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br>(ECF No. 59.) |

Plaintiff is proceeding pro se and in forma pauperis in this action filed pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendant's motion for summary judgment, filed April 9, 2026.

**I.**

**BACKGROUND**

This action is proceeding against Defendant Doctor Aye for retaliation and deliberate indifference to a serious medical need in violation of the First and Eighth Amendments.

Defendant filed an answer to the operative complaint on February 14, 2025. (ECF No. 42.) The discovery and scheduling order was issued on March 18, 2025. (ECF No. 46.)

On April 9, 2026, Defendant filed the instant motion for summary judgment. (ECF No. 59.) Despite receiving two extensions of time, Plaintiff did not file an opposition and the time to

do so has passed. (ECF Nos. 61, 63.)

## II.

## LEGAL STANDARD

### A. Summary Judgment Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

III.

**DISCUSSION**

**A. Summary of Plaintiff's Complaint**

On January 30, 2021, Plaintiff was admitted to the hospital.

On February 2, 2021, Plaintiff had an MRI and was admitted to Adventist Health Hospital. The MRI showed destruction and mass infection in the spine and lung infection.

On February 7, 2021, Plaintiff was discharged from the hospital and was housed at Corcoran State Prison under the primary care of Dr. Aye.

When Plaintiff was discharged from the hospital, the recommended orders were for intravenous antibiotics for 6 to eight weeks minimum, refer back for follow-up with infection specialist and repeat MRI at 2 and 6 weeks to determine if 8 weeks in necessary for intravenous antibiotics.

The initial evaluation on February 7, 2021, was done by nurse German. When Plaintiff spoke to Dr. Aye and advised that he was not able to walk due to spasms, Dr. Aye provided Plaintiff with a wheelchair.

On February 18, 2021, Plaintiff was taken to see nurse who assisted in a telemedicine consult with infectious disease Dr. Felazarta. Dr. Aye failed to forward the hospital report. Dr. Felazarta informed Plaintiff that he had a deadly spine infection and said Plaintiff must be compliant with the 6 to 8 weeks minimum of antibiotics. It was requested that Plaintiff be brought back for follow-up in 2 weeks and for the hospital report to be forwarded to Dr. Felazarta.

Plaintiff told Dr. Aye that on February 18, 2021, Dr. Felazarta did not have the proper reports and documents as he was set to return for a 2-week follow-up. Plaintiff also told Dr. Aye that he could not walk and was in pain. Dr. Aye was dismissive and gave Plaintiff the cold shoulder. Plaintiff advised Dr. Aye that the back spasms are making him drop to his knees and the physical therapist forced him to walk using his own weight. Dr. Ramadan documented the bruises on Plaintiff's knees from falling due to the muscle spasms.

Nurse German told Plaintiff that Dr. Aye falsified reports by saying Plaintiff was getting

better when he clearly was not. Dr. Aye also stated that he evaluated Plaintiff on days when he did not. Plaintiff filed an inmate grievance regarding the falsification of the medical reports by Dr. Aye. Plaintiff also filed a grievance against Dr. Aye for telling nurse Sidu not to renew his accommodation chrono for a wheelchair. Then, after Plaintiff filed the grievance, Dr. Aye renewed the wheelchair accommodation for another 30 days. Dr. Aye advised Plaintiff that he would order a follow-up with Dr. Felazarta within 2 weeks and have the proper documentation forwarded to him. Dr. Aye was aware that Plaintiff filed inmate grievances against him for falsifying medical reports.

After Plaintiff was not seen by Dr. Felazarta within the 2-week period of time, nurse German told Plaintiff there was no order.

Plaintiff told Dr. Aye that he was being deliberately indifferent to his medical needs and Dr. Aye told Plaintiff he was discharging him because he filed inmate grievances against him. Plaintiff also assisted inmate Conde who had a spine infection in filing grievances and advocating for himself. Dr. Aye falsely documented that Plaintiff felt better and was able to walk. Dr. Aye ordered an x-ray of Plaintiff's spine on March 15, 2021, instead of an MRI which is standard procedure prior to taking a patient off antibiotics. When Plaintiff asked Dr. Aye why he did not request an MRI, he responded "I want you out of my facility – out of my care and I am stopping you at 6 weeks if you [sic] infected or not because you 602 me and I took care of you."

On March 20, 2021, a registered nurse informed Plaintiff that Dr. Aye ordered the intravenous antibiotics to end at 6 weeks. Plaintiff refused to remove the intravenous line and told Dr. Aye he was still infected. Dr. Aye was forced to order Plaintiff an MRI and could not discontinue the antibiotics.

On April 9, 2021, an MRI was conducted and an infection was still present, now also in the ribs. The response to the inmate grievance noted the infection resolved which is not true.

On April 15, 2021, Plaintiff was returned to Dr. Felazarta who said that due to the fact that Plaintiff was taken off the antibiotics at 6 weeks, he recommended to discharge and monitor to see what happens. Plaintiff was discharged on April 15, 2021, and returned from the medical unit to SATF on April 21, 2021.

On June 17, 2021, Plaintiff went back to the hospital with a spine infection.

**B. Statement of Undisputed Facts**[1]

1. At all times relevant to the First Amended Complaint (FAC), Plaintiff Jason Erik Plaintiff was a prisoner admitted at California State Prison- Corcoran (COR), in the Correctional Treatment Center (CTC) and was within the custody of the California Department of Corrections and Rehabilitation (CDCR). (FAC, ECF No. 19 at 13.)

2. At all times relevant to the FAC, Defendant Dr. Aye was employed as a Physician and Surgeon at COR. (Declaration of K. Aye ("Aye Decl."), at ¶ 2, ECF No. 59-5.)

3. Plaintiff alleges a First Amendment retaliation claim, and an Eighth Amendment medical deliberate indifference claim against Dr. Aye. Plaintiff alleges that Dr. Aye acted out of retaliation in stopping his antibiotics prematurely and failed to refer him for follow-up appointment with the infectious disease specialist which led to another spine infection. (FAC at 13-23.)

4. On January 31, 2021, Plaintiff, who was housed at Substance Abuse Treatment Facility (SATF), was admitted to Adventist Health Bakersfield (Adventist) for chronic back pain. Plaintiff had a past medical history of Hepatitis C, and intravenous drug use. Plaintiff was admitted to Adventist after testing positive for Covid-19 and expressed worsening of ongoing back pain which reportedly started around Thanksgiving when he lifted two heavy boxes. Schamus was seen by Dr. Kitt, an Infectious Disease Doctor at Adventist. (Aye Decl. at ¶ 6.)

5. During Plaintiff's stay at Adventist, an MRI (Magnetic Resonance Imaging) was Performed on him. The MRI was conducted without intravenous contrast. This limitation made it challenging to distinguish between an infection and degenerative changes in the spine. As a result, it was reported as a possible infection, but a definitive diagnosis was not initially established because cultures[2] taken did not grow any organisms.[3] Plaintiff was ultimately

---

[1] Hereinafter referred to as "UF."

[2] Culture refers to a laboratory tests in which a tissue sample—such as the one taken during a T8 core biopsy— is placed in conditions that encourage the growth of microorganisms like bacteria or fungi. The purpose is to determine whether infectious organisms are present in the tissue.

[3] This result can occur if the infection is due to hard-to-grow organisms, if antibiotics were given before the biopsy,

diagnosed with discitis[4] at the thoracic region T7-8 based on clinical findings and imaging. (Aye Decl. at ¶ 7.)

6. Dr. Kitt prescribed Plaintiff intravenous (IV) antibiotics cefepime and vancomycin for his suspected spinal infection. Schamus received approximately one week of IV antibiotics during his stay at Adventist, and on February 7, 2021, Plaintiff was admitted at the COR Correctional Treatment Center (CTC) for an additional six weeks of these antibiotics. Dr. Kitt recommended a follow-up with Plaintiff in fourteen days, and an MRI of the thoracic spine without contrast in six weeks. However, Plaintiff tested positive for Covid-19, and Dr. Kitt did not conduct follow-up appointments in her clinic with Covid-infected patients. Therefore, CDCR referred Plaintiff to Dr. Felizarta, an outside infectious disease specialist, to see Plaintiff via Telemedicine, and he was given access to Plaintiff's Medical Records. (Aye Decl. at ¶ 8; Pl. Depo. at 30:2-5.)

7. On February 7, 2021, Dr. Aye evaluated Plaintiff and started IV antibiotics. During this visit, Plaintiff complained about having back pain, and therefore, Dr. Aye ordered acetaminophen 650mg and gabapentin[5] 300mg to help him with his back pain management. Additionally, Dr. Aye referred Plaintiff for a physical therapy consultation. (Aye Decl. at ¶ 9; Pl. Depo. at 113:15-17.)

8. On February 10, 2021, Dr. Aye saw Plaintiff during CTC rounding[6]. After referring Plaintiff to physical therapy, Dr. Aye ordered a temporary wheelchair to utilize when

---

or inf the infection is not bacterial in origin. Additionally, the absence of bacterial growth raises the possibility of misdiagnosis, as the findings may reflect a non-infectious cause, such as an inflammatory or neoplastic process, rather than a bacterial infection.

[4] Discitis is an infection or inflammation of the intervertebral disc space, which is the soft tissue located between the bones (vertebrae) of the spine. In this case, the infection was found between the seventh and eighth thoracic vertebrae (T7-T8) in the middle back. This condition can cause back pain, fever, or difficulty moving and is usually diagnosed through a combination of symptoms, physical examination, and imaging tests like MRI.

[5] Gabapentin is a medication in the anticonvulsant class that works by calming overactive nerve cells in the brain and nervous system, mimicking the effects of the neurotransmitter GABA (gamma-aminobutyric acid) to reduce neuronal excitability and pain signaling.

[6] Rounding refers to the process where physicians go from room to room, checking on their patients reviewing their progress, updating treatment plans, and addressing any new concerns or questions. This is a standard practice to ensure ongoing care and communication among the healthcare team.

going to the showers. (Aye Decl. at ¶ 10; Pl. Depo. at 43:2-15.)

8. On February 12, 2021, Dr. Aye ordered blood tests for Plaintiff, specifically measuring his Complete Blood Count (CBC)[7], C-Reactive Protein (CRP)[8] and Erythrocyte Sedimentation Rate (ESR)[9], which are indicators of inflammation. (Aye Decl. at ¶ 11; Pl. Depo. at 99:10-16.)

9. Dr. Aye evaluated Plaintiff on February 13, 2021. Plaintiff stated he has been frequently getting muscle spasms. Further, Plaintiff's blood test results from February 12, 2021, showed that his CRP inflammatory marker was in a normal range; however, his ESR marker was high. (Aye Decl. at ¶ 12.)

10. Dr. Aye saw Plaintiff on February 16, 2021, and he was tolerating the IV antibiotics very well. (Aye Decl. at ¶ 13.)

11. On February 18, 2021, Plaintiff was seen by Dr. Felizarta. Dr. Felizarta suggested continuing the IV antibiotics for at least six weeks and scheduling a follow-up appointment to monitor his progress. (Felizarta Decl. at ¶ 4; Pl. Depo. at 107:4-7.)

12. On February 18, 2021, Plaintiff was seen by the physical therapist, R. Burr. Plaintiff stated that he was doing fine but he had pain in his mid-back. Plaintiff further stated that he has fallen one time due to back spasms. Burr ordered Plaintiff a temporary walker to provide support with ambulation. (Burr Progress Notes, Ex. A, ECF No. 59-3.)

13. On February 19, 2021, Dr. Aye saw Plaintiff, who complained about back pain but also stated that the muscle relaxant and gabapentin that Dr. Aye prescribed were helping. Plaintiff stated that he was previously on gabapentin 600mg which then was changed to gabapentin and Trileptal.[10] Since Plaintiff was no longer receiving Trileptal, he wanted to

---

[7] Complete Blood Count (CBC) is a blood test that measures various components of blood, including red and white blood cells and platelets. It helps detect infections, anemia, and other medical conditions.

[8] C-reactive Protein (CRP) is a protein produced by the liver in response to inflammation. Elevated CRP levels suggest active inflammation or infection.

[9] Erythrocyte Sedimentation Rate (ESR) test measures how quickly red blood cells settle at the bottom of a test tube. A higher rate can indicate inflammation in the body.

[10] 9Trileptal, whose generic name is oxcarbazepine, is an antiepileptic or anticonvulsant medication. It works by reducing abnormal electrical activity in the brain, which helps prevent and control seizures in people with epilepsy. It

increase his gabapentin dosage from 300mg to 600mg. Dr. Aye ordered Schamus gabapentin 600mg. (Aye Decl. at ¶ 14.)

14. On February 22, 2021, Dr. Aye ordered blood tests for Plaintiff, specifically measuring his CBC, CRP, and ESR. (Aye Decl. at ¶ 15.)

15. On February 22, 2021, Schamus was seen by one of the CTC providers, Dr. Ramadan. Based on Dr. Ramadan's progress notes, except for a "back jolt", Schamus did not have any complaints, and his back pain had improved. Plaintiff was able to ambulate and occasionally used a wheelchair. Dr. Ramadan ordered Plaintiff a physical therapy consultation to assess ambulation, to improve exercise tolerance, and to assess the need for the wheelchair. (Ramadan Progress Notes, Ex. B.)

16. Dr. Aye saw Plaintiff on February 25, 2021. Plaintiff's blood test results from February 22, 2021, showed that his CRP inflammatory marker was slightly higher than the normal range, and his ESR marker was high. However, Plaintiff did not have any symptoms such as fever, chills, or lethargy. (Aye Decl. at ¶ 16.)

17. Plaintiff was evaluated by the physical therapist, R. Burr, on February 26, 2021. Plaintiff stated that he was feeling pain in his back area when he was lying down and that periodically his legs would "gave out" when he walks or stands up. Burr advised Schamus to continue using the wheelchair and as his symptoms subside, he should start using a walker instead. (Burr Progress Notes, Ex. C.)

18. Plaintiff was seen by Dr. Ramadan on February 28, 2021. Plaintiff complained about occasional back pain when twisting his trunk. Plaintiff did not have fever, acute vision, or hearing changes. Plaintiff was still using a walker and a wheelchair due to his back pain. (Ramadan Progress Notes, Ex. D.)

19. Dr. Aye evaluated Schmaus's condition on March 3, 2021. Schmaus was also compliant with the IV antibiotics. (Aye Decl. at ¶ 17.)

20. Schamus was evaluated by the physical therapist, R. Burr, on March 5, 2021. Schamus complained of continued body spasms. Based on Burr's evaluation, Schmaus appeared

---

is also sometimes prescribed "off-label" for nerve pain or as a mood stabilizer in bipolar disorder.

to be moving and twisting quickly with no signs of discomfort. (Burr Progress Notes, Ex. E.)

21. Dr. Aye saw Schmaus on March 6, 2021. Dr. Aye noted that Plaintiff stated that he still had some back pain, but he was doing better. (Aye Decl. at ¶ 18.)

22. Dr. Aye saw Schmaus again on March 9, 2021. Based on Dr. Aye's evaluation, Schmaus' back pain was stable. Further, Schmaus received a back brace and IV antibiotics. (Aye Decl. at ¶ 19.)

23. Dr. Aye saw Schmaus on March 12, 2021. He stated that he still had back pain. However, he was not in acute distress and did not have fever/chills, chest pain, headaches, dizziness, or any gastrointestinal (GI) complaints. (Aye Decl. at ¶ 20.)

24. Schamus was evaluated by the physical therapist, R. Burr, on March 12, 2021. Schamus complained of muscle spasms. Based on Burr's evaluation, Schmaus was encouraged to continue to try to get up and walk more as tolerated and safe. (Burr Progress Notes, Ex. F.)

25. On March 15, 2021, Dr. Aye ordered blood tests for Schmaus, specifically measuring his CBC, CRP, and ESR. (Aye Decl. at ¶ 21.)

26. Schmaus was seen by Dr. Ramadan on March 15, 2021. Schmaus complained about episodic muscle spasms shooting to his right leg. Schmaus also complained about chronic pain in his right elbow and requested a steroid injection. Dr. Ramadan ordered Schmaus an x-ray of his elbow, which showed no significant abnormality. Further, Schmaus stated that he recently fell and scratched his right knee. Dr. Ramadan also ordered an x-ray of Schmaus's thoracic spine which showed mild mid-thoracic spine disc degenerative changes. It was also noted that this process should be followed with an MRI. (Ramadan Progress Notes, Ex. G.)

27. Dr. Aye saw Schmaus on March 18, 2021. Schmaus's blood test results showed that both CRP and ESR markers were within normal limits, indicating that Schmaus's inflammation/infection had resolved. Dr. Aye informed Schmaus that his blood test results were all normal. Schmaus complained of upper back pain, but he was able to get up and walk. Schamus did not have any fever/chills, chest pain or shortness of breath, GI issues, or genitourinary complaints. He also requested a permanent wheelchair. Schmaus was advised that he needed to follow-up with the infectious disease specialist. (Aye Decl. at ¶ 22.)

28. On March 19, 2021, Schmaus was seen by the physical therapist, R. Burr. Schmaus was asked if he could go for a walk; however, Schmaus refused stating he is not ready because he is getting better and does not want to mess it up by trying to do too much. (Burr Progress Notes, Ex. H.)

29. Schmaus was seen by Dr. Ramadan on March 21, 2021. Schmaus complained about back and muscle spasms. Dr. Ramadan noted that the inflammatory markers were back to normal; however, Schmaus was resisting the idea of getting discharged from the CTC as long as he is not walking normally and having back pain and muscle spasms with ambulation. Schmaus did not complain of pain while resting. Schmaus had finished his IV antibiotics and still had the Peripherally Inserted Central Catheter (PICC) line. Schmaus stated that the infectious disease doctor told him that he may go back on the IV antibiotics, and he would like to keep the PICC line and insisted on seeing the infectious disease specialist one more time to discuss the issue of reviewing the antibiotics. Schmaus was not very motivated to get physical therapy and was still using a walker and wheelchair. Although Schmaus was claiming back pain and muscle spasms, he did not ask to increase any pain medications. (Ramadan Progress Notes, Ex. I.)

30. Dr. Ramadan saw Schmaus on March 24, 2021. Schmaus complained about back pain during the night and with movement. Schmaus also complained about episodic night sweats and stated that he was supposed to take the antibiotics until the beginning of next month and he was worried that he did not get adequate treatment. Dr. Ramadan ordered him an MRI. (Ramadan Progress Notes, Ex. J.)

31. On March 25, 2021, Dr. Aye ordered blood tests for Schmaus, measuring his CBC and CRP, which were within the normal range. (Aye Decl. at ¶ 23; Pl. Depo. at 99:10-16.)

32. Schmaus was seen by Dr. Pearce on March 27, 2021. Schmaus complained of some back pain due to doing some mild exercises and moving around in his room. Schmaus was worried that he might have reinjured his spine and he stated that after lying down and doing some stretching, his condition did improve. Overall, Schmaus did not complain about significant pain, but he was worried that he was not improving as expected. An MRI of his thoracic spine was already scheduled to further evaluate the previous area of infection. (Pearce Progress Notes, Ex.

K.)

33. Schmaus was seen by Dr. Ramadan on March 30, 2021. Schmaus stated that his condition did not improve as much as he had hoped and complained of suffering from back pain and muscle spasms. Schmaus stated that he could not ambulate without the walker due to the back pain and issues with his balance. He denied any lower extremities weakness or numbness and denied any sphincters control issue. Schmaus reported occasional night sweats, and he stated that he needs more IV antibiotics. Schmaus further stated that he was doing better and did not want to do much with physical therapy. (Ramadan Progress Notes, Ex. L.)

34. On April 2, 2021, Schmaus was seen by the Registered Nurse (RN) R. Gill. Schmaus still had a PICC line. He stated that he did not complete the full course of antibiotics and has an upcoming infectious disease consultation. Schmaus was still complaining about back pain, and he stated that he uses a wheelchair for ambulation. (Gill Progress Notes, Ex. M.)

35. Schmaus was seen by Dr. Ramadan on April 5, 2021. Schmaus continued to complain of back pain and muscle spasms, and he refused to have the PICC line removed. Schmaus stated that he thinks he will need more antibiotics. Schmaus was still ambulating using a walker. He did not have any symptoms suggesting he had radiculopathy. (Ramadan Progress Notes, Ex. N.)

36. On April 7, 2021, Dr. Felizarta evaluated Schmaus. At that time, Schmaus had already completed six weeks of IV antibiotics, which had been discontinued on March 20, 2021. Schmaus was refusing to remove his PICC line, and he believed that he needed a longer course of IV antibiotics. A blood test was performed on Schamus four days after the cessation of antibiotics, specifically measuring CRP and ESR, which are indicators of inflammation. The result showed that both markers were within normal limits, indicating that Schmaus's infection had resolved. Because weekly laboratory monitoring was incomplete during treatment with only one set of inflammatory markers available after treatment, and to ensure the accuracy and confirmation of infection resolution, Dr. Felizarta ordered a follow-up blood test and requested a follow-up appointment with Schamus for further evaluation. (Felizarta Decl. at ¶ 5.)

37. Dr. Aye saw Schmaus on April 8, 2021. He had been seen by the infectious

disease specialist, Dr. Felizarta. Dr. Aye scheduled a follow-up appointment for Schmaus with Dr. Felizarta for the following week. Schmaus was supposed to be discharged from CTC, but he wanted to stay longer, and he was refusing to have his PICC line removed. Dr. Aye explained to Schmaus that it would increase the chance of infection since the line was introduced more than eight weeks ago. (Aye Decl. at ¶ 24.)

38. On April 8, 2021, according to Dr. Felizarta's request, Dr. Aye ordered blood tests for Schmaus, measuring his CBC, CRP, and ESR. Based on Schmaus's blood test results, all three inflammatory markers were within a normal range. (Aye Decl. at ¶ 25.)

39. On April 11, 2021, Schmaus was seen by RN Gill. Schmaus denied having any fever, chills, shortness of breath, wheezing, chest pain, or palpitations. (Gill Progress Notes, Ex. O.)

40. Dr. Aye saw Schmaus on April 14, 2021. He was refusing to have his PICC line removed, and he was not cooperating with his recommended medical care. Dr. Aye fully informed Schmaus of the risks and possible consequences of refusing to remove the PICC line, which may include chances of developing a blood clot, inflammation, and infection of the vein, permanent disability from stroke, pain and suffering, organ failures, infections, blood loss, and death. Schmaus also refused to give up the wheelchair which he was no longer using. According to his physical therapist, he was prescribed a walker as needed, but not the wheelchair. However, Schmaus stated that "if you remove the wheelchair from my cell, he will be responsible if I fall down." (Aye Decl. at ¶ 26.)

41. On April 15, 2021, Dr. Felizarta had a follow-up appointment with Schmaus. Dr. Felizarta reviewed Schmaus's follow-up blood test results, which appeared normal and confirmed the resolution of the infection. Dr. Felizarta further reviewed the MRI results that were performed on Schmaus on April 9, 2021. Although the MRI showed abnormalities, imaging abnormalities are expected for several weeks to months even after resolution of the infection.[11] Based on both

---

[11] It is important to note that MRI is not a reliable tool for detecting ongoing infection or inflammation in the period shortly after treatment, as it may still demonstrate signs even after the infection has resolved. For this reason, I did not initially order an MRI for Schmaus.

sets of blood test results, there was no indication of ongoing spinal infection or inflammation, and therefore, Dr. Felizarta did not prescribe Schmaus additional antibiotics. Because Schmaus's spinal infection was resolved, Dr. Felizarta suggested removal of his PICC line and approved his discharge from CTC. (Felizarta Decl. at ¶ 6.)

42. On April 15, 2021, with the approval of Dr. Felizarta, Dr. Aye discharged Schmaus. Because Schmaus was insisting on prescription of a permanent wheelchair, Dr. Aye extended his prescription for an additional week so that he can use it in the general population and to be seen by his primary care physician for further evaluation. (Aye Decl. at ¶ 27.)

43. Dr. Aye noted Schmaus did not want to be discharged from the CTC and believed that his infection had not been resolved so he needed a longer course of IV antibiotics because he was experiencing pain, but the resolution of an infection does not guarantee the absence of pain. Ongoing pain is not an indicator of an active infection, and pain is a subjective symptom that does not warrant additional antibiotic therapy. Schmaus had already received approximately one week of IV antibiotics during his hospital stay, followed by an additional six weeks of antibiotics under Dr. Aye's care. Prolonged administration of antibiotics (cefepime and vancomycin) beyond the recommended duration can increase the risk of significant side effects.[12] The risk of these adverse effects may be heightened in individuals with a history of substance abuse, as this can impact organ function and metabolism. In Dr. Aye's medical opinion, prescribing further antibiotics solely in response to pain, without objective evidence of infection, could expose the patient to unnecessary risks and serious side effects. (Aye Decl. at ¶ 28.)

44. The standard course for IV antibiotics in cases of spinal infection, such as vertebral osteomyelitis, typically ranges from 6 to 8 weeks, depending on the severity of infection and patient-specific factors. Administering antibiotics for longer than this recommended period is generally not advised due to the increased risk of complications and diminishing therapeutic benefit. Schamus received approximately seven weeks of IV antibiotics, which align with established guidelines for treating spinal infections in patients with similar medical histories, such

[12] The side effects may include neurotoxicity, such as confusion, seizures, and encephalopathy, especially in patients with underlying conditions. Vancomycin can cause nephrotoxicity (kidney damage), ototoxicity (hearing loss), and infusion-related reactions like "Red Man Syndrome."

as those outlined by the Infectious Diseases Society of America (IDSA). (Aye Decl. at ¶ 29.)

45. Schamus admits that he was not informed by staff or doctors at CTC that Dr. Aye was the head doctor, or the supervising provider responsible for his treatment. (Pl. Depo. at 21:1-5.)

**C. Analysis of Defendant's Motion**

Defendant argues he is entitled to summary judgment because the undisputed facts show that: (1) Plaintiff received extensive medical care for his spinal infection from Dr. Aye, other prison medical staff, and an outside infectious disease specialist; (2) Plaintiff's disagreement with Dr. Aye's treatment and stoppage of IV antibiotics at six weeks is a difference of opinion concerning a course of treat and is not an actionable constitutional claim; (3) the six weeks of IV antibiotics treatment Plaintiff received was appropriate, timely, and consistent with community standards; (4) there is no sufficient evidence to create a genuine dispute of fact that Dr. Aye took adverse action against Plaintiff for exercising his First Amendment rights; and (5) alternatively, Dr. Aye is entitled to qualified immunity.

1. Deliberate Indifference to Serious Medical Need

A prisoner's claim of inadequate medical care constitutes cruel and unusual punishment in violation of the Eighth Amendment where the mistreatment rises to the level of "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The two-part test for deliberate indifference requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,' " and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096.

A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Deliberate indifference is a high legal standard," Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm. Jett, 439 F.3d at

1096. In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Labs., 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105–06). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

Further, a "difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082–83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122–23 (9th Cir. 2012) (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).

Here, it is undisputed that Schmaus was diagnosed with discitis at the thoracic region T7-8, for which he was admitted to the CTC to complete an additional six weeks of IV antibiotics. (UF 5, 6.) Defendant acknowledges that this constitutes a serious medical need. (ECF No. 59-1 at 20.)

It is further undisputed that on February 7, 2021, Dr. Aye evaluated Schmaus and started IV antibiotics. During this visit, Schmaus complained about having back pain, and therefore, Dr. Aye ordered acetaminophen 650mg and gabapentin 300mg to help him with his back pain management. Additionally, Dr. Aye referred Schmaus for a physical therapy consultation. (UF 7.) On February 10, 2021, Dr. Aye ordered him a temporary wheelchair to utilize when going to the showers. (UF 8.) On February 19, 2021, Schmaus complained of back pain but also stated that the muscle relaxant and gabapentin that Dr. Aye prescribed were helping. (UF 13.) Schmaus requested Dr. Aye to increase his gabapentin dosage from 300mg to 600mg,

and therefore, Dr. Aye ordered Schmaus gabapentin 600mg to help him with his pain. (Id.) Dr. Aye consistently ordered blood tests for Schmaus and monitored the inflammatory markers in his blood to ensure the infection is resolved before stopping the IV antibiotics. (UF 8, 9, 14, 16, 25, 27, 31, 38.)[13] Further, Dr. Aye discharged Schmaus from CTC after obtaining approval from Dr. Felizarta. (UF 41, 42.) Schmaus has failed to present any evidence showing that Dr. Aye purposefully ignored or failed to respond to his pain or possible medical need.

In addition, it is undisputed that Dr. Aye was just one of the medical providers at CTC, and contrary to Plaintiff's contention, there is no evidence that he was the head doctor or the supervising physician assigned to oversee Plaintiff's treatment. (UF 2, 45.) Indeed, it is undisputed that during Plaintiff's stay at CTC, he was also evaluated by Dr. Ramadan, Dr. Pearce, PT Burr, and Dr. Felizarta. (UF 11, 12, 15, 17, 18, 20, 24, 26, 28, 29, 30, 32, 33, 35, 36, 41.)

Contrary to Schmaus's allegation, the undisputed facts show that Schmaus's infection was resolved prior to the stoppage of the IV antibiotic. (UF 27.) The undisputed facts establish that, based on Schmaus's blood tests and lack of symptoms of a fever, Dr. Aye reasonably believed that Schmaus's infection had resolved and that he did not require an additional course of antibiotics. (UF 27, 29, 36, 38, 39.) Dr. Aye's evaluation was consistent with Dr. Felizarta's evaluation. (UF 41.) Dr. Felizarta notes that MRI imaging abnormalities are expected for several weeks to months even after resolution of the infection. (Id.) Dr. Aye was also aware that prolonged use of antibiotics could result in adverse side effects to Schmaus. (UF 43.) Thus, the evidence demonstrates that Dr. Aye did not have a sufficiently culpable state of mind when he did not order additional antibiotics. Farmer, 511 U.S. at 834.

Plaintiff alleges that Dr. Aye stopped his IV antibiotics at six weeks, while his spine was still infected, without performing an MRI to determine if his infection was resolved. (FAC at 19-20.) However, it is undisputed that Dr. Aye provided Plaintiff with regular blood tests to determine his infection levels and stopped his IV antibiotic cs after resolution of his infection. (UF 8, 9, 14, 16, 25, 27, 31, 36, 38, 41.) In fact, outside infectious disease specialist, Dr.

---

[13] See Toguchi, 391 F.3d at 1057-1061 (affirming summary judgment to defendants where the evidence showed that the defendant had treated the inmate's condition and was responsive to the inmate's medical needs).

Felizarta, also opined that the infection had resolved and further antibiotics were not warranted. (UF 41.) Further, it is undisputed that an MRI is not the appropriate tool to determine resolution of the infection because imaging abnormalities are expected for several weeks to months even after resolution of the infection. (UF 41.) Plaintiff's disagreement or dissatisfaction with the medical treatment provided by Dr. Aye does not establish a claim for deliberate indifference under the Eighth Amendment. Toguchi, 391 F.3d at 1058; Jackson, 90 F.3d at 332.

Lastly, there is no evidence that Dr. Aye's decision to discontinue Plaintiff's IV antibiotics was medically unacceptable under the circumstances. Contrary to Schmaus's allegations, there is evidence that Dr. Aye's treatment was medically acceptable because the appropriateness of Dr. Aye's decision to stop IV antibiotics was confirmed by the infectious disease specialist, Dr. Felizarta. Like Dr. Aye, Dr. Felizarta found that Schmaus's infection was resolved, and an additional course of IV antibiotics were not required. (UF 41). Dr. Felizarta did not prescribe Schmaus additional antibiotics. (Id.) Additionally, Schmaus was seen by two other non-defendant medical providers at CTC, Dr. Ramadan and Dr. Pearce and complained about back pain and that his infection was not resolved. (UF 15, 18, 26, 29, 30, 32, 33, 35) Both non-defendant providers did not prescribe Schmaus additional course of antibiotics and believed, based on Schmaus's blood test reports, that his infection was resolved. (Id.) Thus, there is no showing that Dr. Aye's decision to stop Plaintiff's IV antibiotics at six weeks was medically unacceptable.[14] Snow, 681 F.3d at 988; Jackson, 90 F.3d at 332. Accordingly, Defendant Dr. Aye's motion for summary judgment should be granted.

2. Retaliation

"Within the prison context, a viable claim of First Amendment retaliation entails five

[14] Plaintiff's claim that Dr. Aye falsified medical reports by stating that he had no pain or that the pain was getting better is insufficient to give rise to a claim for deliberate indifference, particularly in light of the undisputed evidence listed above. Evans v. Diaz, No. 1:22-CV-00291 ADA BAM PC, 2022 WL 17417816, at *12 (E.D. Cal. Dec. 5, 2022) (failure to state a claim for fabricated medical reasoning in medical report); Martin v. Pfeiffer, No. 1:22-CV-00889 AWI BAM PC, 2022 WL 4345686, at *8 (E.D. Cal. Sept. 19, 2022), report and recommendation adopted, No. 1:22-CV 00889 AWI BAM PC, 2022 WL 17406535 (E.D. Cal. Dec. 2, 2022) (Plaintiff's complaint fails to state a claim based on allegations of a false medical injury report); Sanford v. Eaton, No. 1:20-CV-00792 BAM (PC), 2021 WL 1172911, at *7 (E.D. Cal. Mar. 29, 2021) (denying a claim alleging falsified medical report and statements made by Plaintiff), denying to adopt on other grounds, Sanford v. Eaton, No. 1:20-CV00792-JLT BAM(PC), 2022 WL 168530, at *2 (E.D. Cal. Jan. 19, 2022).

basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 566 (9th Cir. 2005). Inmates have a First Amendment right to file prison grievances. Id. at 567–68.

To establish the causation element, a plaintiff must show that "his protected conduct was the 'substantial' or 'motivating' factor behind" the defendant's alleged misconduct. Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)). The Ninth Circuit has "repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient." Wood v. Yordy, 753 F.3d 899, 904–05 (9th Cir. 2014) (citing Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1061 (9th Cir. 2011); McCollum v. Cal. Dep't of Corr. & Rehab., 647 F.3d 870, 882 (9th Cir. 2011)). The plaintiff must provide "probative evidence to establish a crucial link in the logical chain." Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995) (holding timing and speculation alone insufficient for retaliation claim.) A retaliation claim will not stand when premised simply on "the logical fallacy of post hoc, ergo propter hoc." Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000). The inmate must demonstrate a nexus between the alleged adverse conduct and the protected speech. Id. There must be a showing that the adverse action was taken out of "retaliatory animus" to "silence and punish" the inmate because of their protected conduct, and not for some other reason. Shepard v. Quillen, 840 F.3d 686, 691 (9th Cir. 2016).

The adverse action must chill a person of ordinary firmness from engaging in the protected conduct. Rhodes, 408 F.3d at 568–69. An objective standard governs this inquiry. Brodheim, 584 F.3d at 1271. "A plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" Id. (quoting Rhodes, 408 F.3d at 568–69). Finally, a plaintiff bears the burden of proving the absence of legitimate correctional goals for the defendant's challenged conduct. Pratt, 65 F.3d at 806. When considering this element, courts "afford appropriate deference and flexibility to prison officials in the evaluation

of proffered legitimate penological reasons for conduct alleged to be retaliatory." Id. at 807 (quotations omitted).

Here, the undisputed evidence demonstrates that Plaintiff was admitted at CTC to receive a six-week course of IV antibiotics, with a recommendation to be medically evaluated at the conclusion of those six weeks to determine if an extension of the antibiotics to eighth weeks was warranted. (FAC at 13.) The undisputed facts show that Dr. Aye administered the IV antibiotics to Schmaus for a total of six weeks which were discontinued after his review of Schmaus's blood report showed that the infection was resolved. (UF 8, 9, 14, 16, 25, 27, 31, 29.) The administration of additional antibiotics could have resulted in adverse side effects to Schmaus. (UF 43.) Thus, Dr. Aye's treatment was based on objective medical data, demonstrating that Dr. Aye's would have treated Schmaus the same regardless of any grievances submitted by Schmaus.

Further, Dr. Aye's decision to stop IV antibiotics was confirmed by Dr. Felizarta. Like Dr. Aye, Dr. Felizarta found that Schmaus's infection was resolved and additional IV antibiotics were not required, and he did not prescribe Plaintiff additional antibiotics. (UF 41). In addition, Plaintiff was seen by two other non-defendant medical providers at CTC, Dr. Ramadan and Dr. Pearce, and complained about back pain and that his infection was not resolved. (UF 15, 18, 26, 29, 30, 32, 33, 35.) These providers also did not prescribe Schmaus additional course of antibiotics and believed, based on Schmaus's blood test reports, that his infection was resolved. (Id.) Thus, the evidence demonstrates that Plaintiff's treatment was not affected by his grievances. Plaintiff has failed to demonstrate that Dr. Aye took any adverse action against him because he filed an inmate grievance, and Plaintiff's contention that Dr. Aye's retaliatory mental state led to stoppage of his IV antibiotics is based on nothing more than pure speculation which is insufficient to create a triable issue of fact. See Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1028 (9th Cir. 2001) (plaintiff's belief that defendant acted with an unlawful motive, without supporting evidence, is not cognizable evidence on summary judgment.).Accordingly, Defendant's motion for summary judgment should be granted.

///

///

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendant's motion for summary judgment (ECF No. 59) be GRANTED; and

2. The Clerk of Court be directed to enter judgment in favor of Defendant Dr. Aye.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **fourteen (14)** days after being served with these Findings and Recommendations, the parties may file written objections with the Court, limited to 15 pages in length, including exhibits. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **August 10, 2026**

STANLEY A. BOONE
United States Magistrate Judge